UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15-CV-00047-GNS

AMTOTE INTERNATIONAL, INC.                                          PLAINTIFF

v.

KENTUCKY DOWNS, LLC
ENCORE GAMING, LLC                                                 DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Amended Complaint (DN 78, 80) pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART**.[1]

## I.    BACKGROUND

Plaintiff AmTote International, Inc. ("AmTote") brought this action for injunctive and other relief against Defendants Kentucky Downs, LLC ("Kentucky Downs") and Encore Gaming, LLC ("Encore"), asserting claims for breach of contract, tortious interference with a contractual relationship, and misappropriation of trade secrets.[2]  Kentucky Downs operates a thoroughbred racetrack in Franklin, Kentucky.  Gambling on horse races is available there in three different formats:  live racing, involving horses physically present at the track which is the variety of horseracing perhaps most familiar to casual observers; simulcast racing, where customers bet on live races held elsewhere; and historical racing, where bets can be made on the

---

[1] Because Defendants' Motion to Dismiss Complaint (DN 34, 40) is subsumed by Defendants' Motion to Dismiss Amended Complaint, the Motion to Dismiss the Complaint is denied as moot. Likewise, the parties have already engaged in limited discovery, and Plaintiff's Motion to Expedite Scheduling Conference (DN 19) is therefore denied as moot.

[2] While AmTote initially asserted claims against three individuals, AmTote abandoned those claims in its Amended Complaint.

outcome of previously-run races utilizing an interface that is visually similar to slot-machines. (Defs.' Mem. in Supp. of Mot. to Dismiss Am. Compl. 3, DN 80-1 [hereinafter Defs.' Mot.].) The present motion is primarily centered around Kentucky Downs' historical racing, which is presently conducted on machines supplied by Encore.

Pari-mutuel wagering is the traditional form—and often the only lawful form—of gambling on horse races. *See, e.g.*, KRS 230.361.  In this type of betting system, wagers for each race are placed into a common pool, with the winning bettors dividing the pool after the deduction of various commissions and fees.  The laws and regulations governing gambling, which vary significantly among the states, may dictate certain procedures, functionality, or taxes. AmTote and other totalizator vendors provide systems that perform the computations necessary for the wagering on races.  The Kentucky Horse Racing Commission ("KHRC") defines the term "totalizator"[3] as "the system, including hardware, software, communications equipment, and electronic devices that accepts and processes the cashing of wagers, calculates the odds and prices of such wagers, and records, displays, and stores pari-mutuel wagering information."  810 KAR 1:150 § 1(7).

Historical horse racing in Kentucky is specifically authorized by regulation.  *See* 810 KAR 1:011 § 3.  Under KHRC regulations, historical horse racing is defined as "any horse race that:  (a) [w]as previously run at a licensed pari-mutuel facility located in the United States; (b) [c]oncluded with official results; and (c) [c]oncluded without scratches, disqualifications, or dead-heat finishes."  810 KAR 1:001 § 1(30).  Historical racing terminals must be approved by the KHRC and specific regulatory reports are required for this type of wagering.  (Defs.' Mot. to Dismiss Ex. 4-5, DN 78-5 to 78-6.)

---

[3] Kentucky administrative regulations use the spelling "totalizator" while AmTote uses the spelling "totalisator."

On August 19, 2011, Kentucky Downs and RaceTech KY, LLC ("RaceTech") entered into an equipment and license agreement ("RaceTech Agreement") authorizing Kentucky Downs to offer an historical racing product owned by RaceTech through terminals branded "Instant Racing." (Defs.' Mot. 5-6; RaceTech Agreement § 3, DN 78-8). The RaceTech Agreement specified that RaceTech would provide AmTote's totalization services for the Instant Racing system and Kentucky Downs, in turn, authorized AmTote to share daily operational reports to RaceTech for billing purposes. (RaceTech Agreement § 6.2).

Approximately three months after entering into the RaceTech Agreement, Kentucky Downs and AmTote executed a separate Totalisator Service Agreement ("TSA") under which AmTote was to provide certain totalizator service and products to Kentucky Downs. (Totalisator Service Agreement, DN 6-1 [hereinafter TSA]). Of particular significance, the TSA contained a broad confidentiality clause and also stated that AmTote would be the "exclusive provider of the services and/or products identified on Schedules 1 and 2." (TSA §§ 2, 9). Neither schedule made any mention of historical racing, except for one provision indicating that AmTote would make player data files for Instant Racing available to Kentucky Downs for a specified fee. (TSA sched. 2, § 5). The TSA was amended twice, first adding the lease of Instant Racing terminals through an incorporated Schedule 3, and then granting a purchase option to Kentucky Downs for those terminals in the second amendment. (Totalisator Service Agreement Amendment No. 1, at 1, DN 6-2; Totalisator Service Agreement Amendment No. 2, Schedule 3, DN 6-3).

Events in early 2015 precipitated this lawsuit. On February 19, 2015, RaceTech notified Kentucky Downs that RaceTech was exercising its contractual right to terminate the RaceTech Agreement at the end of the following month. (Defs.' Mot. 8-9). After the RaceTech Agreement

expired Kentucky Downs began offering historical racing through Encore, which provided both historical racing and the related totalizator services.  (Defs.' Mot. 9-11).

In this action, AmTote alleges Kentucky Downs' relationship with Encore has breached the exclusivity and confidentiality provisions of the TSA.  (Am. Compl. 17-18, DN 66, 73). AmTote also claims that Encore tortiously interfered with AmTote's contract with Kentucky Downs, and that Kentucky Downs and Encore misappropriated AmTote's trade secrets in violation of the Kentucky Uniform Trade Secrets Act ("KUTSA").  (Am. Compl. 17-20).

## II.     JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and Defendant and the amount in controversy exceeds the sum of $75,000.00.

## III.     STANDARD OF REVIEW

To survive dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted).  "But the district court need not accept a bare assertion of legal conclusions." *Id.* (internal quotation marks omitted) (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it

tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (citation omitted).

Motions to dismiss are generally limited to consideration of assertions made within the pleadings. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). Courts may also consider written instruments attached as exhibits to parts of the pleadings. *See* Fed. R. Civ. P. 10(c). In support of its claim AmTote attached a copy of the TSA, including the two amendments to its Amended Complaint. These attachments—central to the claim and referenced in the Complaint itself—may be considered on a motion to dismiss. *See Weiner*, 108 F.3d at 89. Similarly, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Weiner*, 108 F.3d at 89 (citation omitted). Defendants have attached to their motion a copy of the RaceTech Agreement that is referenced—albeit indirectly—in the TSA, which is also considered as discussed below.

## IV.   DISCUSSION

### A.   Breach of Contract Claims

AmTote alleges Kentucky Downs has breached the exclusivity and confidentiality provisions of the TSA. (Am. Compl. ¶¶ 74-77). Defendants argue that the TSA should be interpreted in light of the RaceTech Agreement, which preceded the TSA and that, so construed, AmTote has failed to state a claim. (Defs.' Mot. 18-20). Further, even without consideration of the RaceTech Agreement, Defendants argue they have not breached the exclusivity or confidentiality provisions of the TSA. (Defs.' Mot. 20-23).

Under Maryland law,[4] "[t]he construction of contractual language is, in the first instance, 'a question of law for the court to resolve.'" *Lerner Corp. v. Three Winthrop Props., Inc*., 723 A.2d 560, 563 (Md. Ct. Spec. App. 1999) (quoting *Shapiro v. Massengill*, 661 A.2d 202, 208 (Md. Ct. Spec. App. 1995)).   Contracts are to be interpreted in accordance with their plain meaning.  *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 469 (Md. 2004) ("In determining the meaning of contractual language, Maryland courts apply the principle of the objective interpretation of contracts.   Applying objective interpretation principles, the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean."  (internal citation omitted) (citation omitted)).   A contract is not ambiguous merely because the parties disagree as to its interpretation.  *See Fultz v. Shaffer*, 681 A.2d 568, 578 (Md. Ct. Spec. App. 1996).   Rather, if the disputed term "is clear as to its meaning, there is no room for construction and it must be presumed that the parties meant what they expressed."  *Id*. at 577 (citation omitted).   For the reasons set forth below, the Court grants Defendants' motion to dismiss as it pertains to AmTote's claim for breach of the TSA's exclusivity provision, but denies the motion regarding the claims for breach of confidentiality.

### 1.    *Exclusivity*

AmTote claims the TSA requires exclusivity for all services AmTote provided to Kentucky Downs, including totalization services for historical racing.  (Pl.'s Resp. to Mot. to Dismiss 13-16, DN 82 [hereinafter Pl.'s Resp.]).  As noted above,  the TSA states that "AmTote will be the exclusive provider of  the services and/or products identified on Schedules 1 and 2." Because some of those services could apply to historic racing, AmTote reasons that factual

---

[4] The TSA's choice of law provision dictates that Maryland law applies.  (TSA § 12.3).

6

issues exist which render dismissal at this point inappropriate. (Pl.'s Resp. 14-16). Nowhere in either schedule, however, is there any mention of the term "historical racing." Instead, Schedule 1 refers to the "Core Totalisator System" and "Simulcast Wagering Services" and lists terminal functions and reporting capacity. (TSA sched. 1, §§ 1, 5). Schedule 2 details equipment and personnel to be provided. (TSA sched. 2, §§ 3-4). Schedule 2, Section 5 does refer to "Instant Racing", but parenthetically recognizes that Instant Racing was being provided by RaceTech and states that player data files related to Instant Racing would be available from AmTote at a set fee.[5] (TSA sched. 2, § 5). This reference explicitly recognizes that the Instant Racing service was being provided by RaceTech, and thus was *not* being provided by AmTote under the TSA. Importantly, Section 5—which is captioned "Service Fees"—makes no mention of any fee charged by AmTote for tote services related to Instant Racing or any other form of historical racing. The TSA barely mentions Instant Racing and certainly expresses no intent to supplant RaceTech's contractual duty to provide Instant Racing to Kentucky Downs. Thus, the plain language of the TSA does not extend its exclusivity obligation to the tote services for the historical racing product Kentucky Downs currently receives from Encore.

AmTote contends that discovery is necessary because the services listed in Schedules 1 and 2 could be as equally applicable to historical racing as to live and simulcast racing. (Pl.'s Resp. 8, 15). The TSA recognizes that Instant Racing was already being provided by RaceTech when AmTote and Kentucky Downs signed the TSA. Any services ancillary to Instant Racing could not have been within the intended scope of exclusivity under the TSA, absent some stated

---

[5] Schedule 2, Section 5 of the TSA provides, in part, that "[t]he player tracking data file for Instant Racing (provided by RaceTech, LLC) will be available for a fee of $0.50 per terminal per day . . . ." (TSA sched. 2, § 5). This language *would* support a claim for exclusivity with respect to player tracking data files for Instant Racing, but AmTote has made no claim that Kentucky Downs is currently receiving this service related to Instant Racing from another provider.

intent otherwise.  *See Dennis v. Fire & Police Emps. Ret. Sys.*, 890 A.2d 737, 747 (Md. 2006) ("A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.  In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed."  (alteration in original) (internal quotation marks omitted) (citation omitted)).  Thus, the TSA does not support a claim that Kentucky Downs was required to use AmTote as its exclusive provider of services described in Schedules 1 and 2 as they may relate to Instant Racing.

AmTote attempts to conflate Instant Racing, which is referenced in Schedule 2, with historical racing, which is not mentioned in either the TSA or in Schedules 1 or 2.  Even if the TSA could be read expansively to include the Instant Racing service provided by RaceTech under the RaceTech Agreement (which the Court has determined it cannot), AmTote clearly has no basis for extending its exclusivity rights to the broader term of historical racing.  For example, if Schedule 2 referenced services relating to the sale of Coca-Cola, AmTote could not claim it had the right of exclusivity with respect to Kentucky Downs' sale of all soft drinks.  Thus, if Kentucky Downs began selling Pepsi products, AmTote would have no right to insist that it provide services for that different product because AmTote's service (and thus exclusivity) was limited to Coca-Cola.  Similarly, there is no basis under the TSA for claiming that its reference to Instant Racing extends AmTote's exclusivity protection to all forms of historical racing.  There is no allegation that Kentucky Downs is presently offering Instant Racing.  To the contrary, the whole premise of this lawsuit is that Kentucky Downs has switched to the historical racing product developed by Encore in place of Instant Racing.  AmTote has no viable claim

under the TSA that Kentucky Downs was precluded from purchasing tote services for historical racing from another source following the cancellation of the RaceTech Agreement.

AmTote further claims exclusivity based upon a clause appearing above the parties' signatures stating that the "Master Terms and Conditions as set out herein [] will govern **all services** provided by AmTote, International, Inc." (Pl.'s Resp. 2 (emphasis added) (citing TSA 6)). AmTote argues that since it provided Instant Racing totalization for Kentucky Downs under the RaceTech Agreement, the "all services" provision encompasses all historical racing tote services. (Pl.'s Resp. 2). This argument has no merit for at least two reasons. First, exclusivity under the TSA is expressly limited to services "identified in Schedules 1 and 2"—the "all services" clause is not included in either of those schedules. Second, AmTote's proffered construction ignores the merger clause contained in the caption of the TSA which states: "[i]n addition to these Master Terms and Conditions all attached schedules are incorporated by reference into this Agreement and are deemed to be a part of and make up *the entire Agreement*." (TSA 1 (emphasis added)). Under Maryland law, merger clauses are generally enforceable. *See Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 985-86 (Md. 2011) (citations omitted). This merger language unambiguously limits the contract terms to the TSA and its schedules and precludes expanding the scope of the TSA to services AmTote may have rendered to Kentucky Downs under the RaceTech Agreement.[6]

---

[6] The parties' subsequent amendments reflect how they intended the TSA to operate. When leases for Instant Racing terminals were later added by the two amendments to the TSA, those machines were described in Schedule 3. While Schedule 3 governs the lease and purchase of the Instant Racing terminals, exclusivity was limited to services under Schedules 1 and 2. Listing the leases in Schedule 3 instead of Schedule 2 avoided the inconsistency which would have resulted if those leases were to be exclusive since Kentucky Downs was already leasing similar machines from RaceTech.

Reference to the RaceTech Agreement—though not essential to analyze AmTote's exclusivity claims—confirms the conclusion that the TSA did not apply to services provided under the RaceTech Agreement.[7]   The RaceTech Agreement specifies that RaceTech licensed Instant Racing to Kentucky Downs and that RaceTech was obligated to provide AmTote totalization for that gaming system.  The RaceTech Agreement governed the provision of Instant Racing services to Kentucky Downs without any direct contractual obligations between Kentucky Downs and AmTote.  If there was an intent to capture any of those services within the ambit of the TSA, the latter contract would have done so explicitly as it did with respect to the player data tracking files.  Absent such a reference, the two agreements were clearly intended to remain separate.

For these reasons, AmTote has failed to state a breach of contract claim against Defendants regarding a breach of the exclusivity provision of the TSA.  The motion to dismiss will be granted with respect to this claim.

### 2.  *Confidentiality*

The TSA contains a comprehensive confidentiality clause.  (TSA § 9).  The term "confidential information" is defined as "information [obtained] [from] the other party which is confidential or proprietary in nature . . . ."  (TSA § 9).  The confidentiality clause prohibited Kentucky Downs from disclosing any confidential information, including:

---

[7] Reference to the RaceTech Agreement does not convert the present motion into one for summary judgment because the RaceTech Agreement is implicitly referred to in the TSA and definitively describes the provision of Instant Racing totalization services by AmTote (through Kentucky Downs) when the TSA was signed.  *See Composite Techs., L.L.C. v. Inoplast Composites SA de CV*, 925 F. Supp. 2d 868 873-74 (S.D. Ohio 2013) (noting that invoices referenced in an exhibit to the complaint but not included as an exhibit may be considered by a court in ruling on a motion to dismiss without converting the motion into a summary judgment motion).

(a) any specifications, protocols, configurations and routing data related to the AmTote facilities, technology and network services or any of Customer's specifications, protocols, configurations, technology and application software; (b) any processes, methods, ideas, techniques, drawings, works of authorship, inventions, know-how, software, algorithms and formulae related to the products or services of AmTote or Customer; (c) information concerning research, development, financials, procurement, pricing, customer lists, customer service specifications, investors, employees, third party relationships, forecasts and marketing plans of AmTote or Customer; (d) any other information or material that is proprietary to AmTote or Customer; and (e) any other information that is marked confidential , restricted, proprietary or with a similar designation whether written or oral.

(TSA § 9).

Even though services provided by AmTote under the TSA did not pertain to historical racing, AmTote has stated a plausible claim that Kentucky Downs may have shared information related to the TSA services that was used by Encore in the development of the new gaming system. Therefore, AmTote's claims for breach of Kentucky Downs' confidentiality obligations under the TSA can go forward, and the motion to dismiss will denied on this basis.

### B.     Tortious Interference Claim

Defendants argue that since Plaintiff's tortious interference claim relates to the misappropriation of trade secrets, the claim is preempted by KUTSA. (Defs.' Mot. 38). The Court declines to dismiss AmTote's tortious interference claim on this basis. AmTote has alleged that Encore induced Kentucky Downs to breach its agreement with AmTote and to leak confidential information to Encore. (Am. Compl. ¶ 82). While misappropriation may be an element related to this claim, this alone is insufficient for KUTSA to preempt AmTote's tortious interference claim. *See Lewis*, 2010 WL 3470198, at \*9-10. "Where the state-law claim has a factual basis independent from the facts establishing the [Uniform Trade Secrets] claim, 'the portion of the claim supported by an independent factual basis survives preemption.'" *Stolle Mach. Co. v. Ram Precision Indus.*, 605 F. App'x 473, 484-85 (6th Cir. 2015) (citation omitted).

Therefore, "KUTSA does not preempt all causes of action that have to do with trade secrets, and if misappropriation is simply one element of a claim, then the cause of action is not necessarily preempted." *Brake Parts, Inc., v. Lewis*, Nos. 09-132-KSF, 10-212-KSF, 2010 WL 3470198, at *9-10 (E.D. Ky. Aug. 31, 2010) (citation omitted).

Defendants are correct that absent a breach of contract, a tortious interference with a contract claim will not lie. *See Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. App. 2012) (citation omitted). The Court has already determined that AmTote's breach of contract claim regarding confidentiality can proceed, so too can the tortious interference claim related to the breach of confidentiality.

## C.   Misappropriation of Trade Secrets Claim

Defendants also seek dismissal of Plaintiff's KUTSA claim.   Under KUTSA, Plaintiff must show:  1) a trade secret exists and 2) that trade secret has been misappropriated. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 794 (W.D. Ky. 2001) (citing KRS 365.880).   Under the KUTSA, the term "trade secret" is defined as "'information, including a formula, . . . method, technique, or process,' that '[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use,' and '[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Brake Parts, Inc., v. Lewis*, 443 F. App'x 27, 29 (6th Cir. 2011) (internal quotation marks omitted) (citing KRS 365.880(4)).

In general, AmTote does not have to show a "reasonable probability" at this stage of the litigation; rather, it must show that the trade secrets claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   As this Court has noted, "[t]he plausibility

standard falls between mere possibility, at the low end, and probability at the other extreme." *Church Mut. Ins. Co. v. Smith*, No. 3:14-CV-749-JHM, 2015 WL 3480656, at *4 (W.D. Ky. June 2, 2015). The Court must determine whether there is sufficient evidence "for the Court to draw the reasonable inference that [Defendants] . . . are 'liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Upon request of Defendants and pursuant to the Court's order, AmTote previously supplemented its trade secret allegations with more specificity. (*See* Notice of Suppl., DN 36). Defendants correctly note that without the identification of trade secrets misappropriated, no KUTSA claim is stated. AmTote's Amended Complaint alleges the trade secret at issue is AmTote's Proprietary Operator Interface ("POI").[8] (Am. Compl. ¶ 73). Defendants claim AmTote has not pled any facts to support a trade secret in this matter and that the Amended Complaint simply states legal conclusions that the POI is a trade secret. (Defs.' Mot. 27-28). The Court concludes, however that the Amended Complaint plausibly pleads the existence of a trade secret. While Paragraph 73 does not clearly specify the parameters of the POI, the Amended Complaint as a whole does plausibly establish the POI as a trade secret. For example, Paragraph 22 specifically defines "proprietary" information and alleges economic value. (Am.

---

[8] In particular, AmTote explains the POI as follows:

> [The detailed totalisator system] reports and their usage in the operation of a historical horse racing enterprise comprise a Proprietary Operator Interface between AmTote and its live and historical horse racing customers that derives independent economic value from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from its disclosure or use. The Proprietary Operator Interface is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Am. Compl. ¶ 44).

Compl. ¶ 22).  Further, AmTote plausibly alleges its information is not generally known and details efforts AmTote took to maintain its secrecy.  (Am. Compl. ¶ 44).  Therefore, the Amended Complaint plausibly states that a trade secret exists in this case.  *See Brake Parts, Inc.*, 443 F. App'x at 29.

Next to be considered is whether misappropriation is sufficiently stated.  To establish misappropriation, AmTote must show the acquisition of the "trade secret as a result of a confidential relationship" and "the unauthorized use of a trade secret."  *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003).  As with AmTote's breach of contact claim, AmTote has plausibly established that the TSA imparted  a duty on the part of Kentucky Downs to maintain the secrecy of any information obtained in the course of AmTote's services under that contract.  (TSA § 1, ¶ 9).  Additionally, AmTote may be able to demonstrate a confidential relationship relating to AmTote's services which it rendered to Kentucky Downs  under the RaceTech Agreement.  Therefore, AmTote has met its low burden to establish a trade secret may have been acquired through a confidential relationship.

AmTote has also plausibly established "use" of AmTote's trade secret by Defendants.  Defendants contend that AmTote has merely speculated that Encore utilized trade secret information in establishing its own totalizator.  (Defs.' Mot. 30).  AmTote concedes that it has made its allegations on "information and belief" rather than direct evidence.  (Pl.'s Resp. 22).  The Sixth Circuit, however, allows plaintiffs to establish trade secret use through circumstantial evidence that shows:  "(1) the misappropriating party had access to the secret and (2) the secret and the design share similar features."  *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005).

14

In this case, AmTote has established direct evidence plausibly indicating that Encore representatives requested  AmTote's reports from Kentucky Downs and that Kentucky Downs may have provided such access.  (Pls.' Resp. 24).  Therefore, AmTote has sufficiently established access under the two-part use test.  AmTote has also plausibly established similarity between its alleged trade secret and Encore's totalizator.  At this point in the litigation, AmTote has received two Encore reports from the KHRC which it alleges are substantially similar to the reports its trade secret generates.  (Am. Compl. ¶ 73).  Further, AmTote alleges that Encore has described its product as having a "fundamental similarity of the architecture . . . ."  (Am. Compl. ¶ 63 (internal quotation marks omitted)).  Defendants admit the Encore system does have general similarity to the RaceTech system, but claims such similarity is present in all historical racing systems.  (Defs.' Resp. 34).  This point rings hollow, considering RaceTech's system was the only historical racing system in existence before Encore announced its competing system.  (Pl.'s Resp. 4).  This particular industry is relatively new and the Court cannot definitively conclude— as Defendants suggest—that "reverse engineering" of Plaintiff's trade secrets could not plausibly have occurred.  (Defs.' Mot. 31).

Similarly, the Court cannot conclusively determine at this stage whether Encore could have established its system independently using only the reports provided by the KHRC or through trade secret misappropriation.  The circumstances of this case indicate that either could be plausible.  Encore's system is not yet fully detailed and the Court cannot conclude exactly how its system was developed.  What is clear, however, is that Encore may have had access to AmTote's trade secrets through Kentucky Downs, and Encore's system bears at least some similarities to AmTote's system.

The evidence presented up to this point is circumstantial, but nonetheless is sufficient to allow Plaintiff to survive a motion to dismiss.  *See Stratienko*, 429 F.3d at 600.  Plaintiff's claims need not be fully developed to survive the present motion.  Pleadings based on factual information that create a reasonable inference of misappropriation are sufficient to survive a motion to dismiss and AmTote has met its burden in this case.  *See Cassidy v. Teaching Co., LLC*, No. 2:13-CV-884, 2014 WL 1599518, at *3 (S.D. Ohio, Apr. 21, 2014) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." (quoting *Arista Records, LLC v. Does 3*, 604 F.3d 110, 120 (2d Cir. 2010))).  Thus, the Court declines to grant Defendants' motion to dismiss AmTote's trade secret claims.

## V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Amended Complaint (DN 78, 80) is **GRANTED IN PART** and **DENIED IN PART**. **FURTHER, IT IS HEREBY ORDERED** that Plaintiff's Motion to Expedite Scheduling Conference (DN 19) and Defendant's Motion to Dismiss Complaint (DN 34, 40) are **DENIED AS MOOT**.

**Greg N. Stivers, Judge**
**United States District Court**

March 31, 2016

cc:      counsel of record

16