UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15-CV-0047-GNS

AMTOTE INTERNATIONAL INC.                                                                    PLAINTIFF

VS.

KENTUCKY DOWNS, LLC *ET AL*                                                              DEFENDANTS

**MEMORANDUM OPINION
AND ORDER**

INTRODUCTION

This is a discovery dispute that has resulted in cross motions to compel by Plaintiff AmTote International, Inc. and Defendants Kentucky Downs, LLC, Exacta Systems, LLC, and Magellan Gaming, LLC. Plaintiff's motion to compel is located at (DN 151 SEALED and DN 152). Defendants' response is at (DN 163 SEALED and DN 165), and Plaintiffs' reply is at (DN 172 and DN 173 SEALED). Defendants' motion is at (DN 153 SEALED and DN 154). Plaintiffs' response is at (DN 161 and DN 162 SEALED), and Defendants' reply is at (DN 170). Both motions are ripe for review. For the reasons set forth below, AmTote's motion is granted in part, and Defendant's motion is denied.

Discussion

A. Background

This dispute arises out of the Defendants' alleged misappropriation of AmTote's confidential and proprietary information. The action contains claims of breach of contract,

tortious interference with an existing contract, and actual and threatened misappropriation of trade secrets. AmTote filed the current version of its complaint, the third amended complaint, on May 5, 2017 (DN 142 SEALED).

At the time relevant to the dispute, AmTote provided totalisator services[1] to Defendant Kentucky Downs for its pari-mutuel wagering operation.[2] A totalisator functions to calculate the odds of a given historical pari-mutuel horse race and display a ticket of the odds to the end user (DN 142 SEALED at PageID # 3497 ¶ 17). AmTote and Kentucky Downs entered into a Totalisator Service Agreement ("TSA") on November 10, 2011 (Id. at PageID # 3500 ¶ 31). The TSA contains language intended to protect AmTote's proprietary information, as well as the proprietary information of third parties who contract with AmTote. First, the definitions section states as follows:

> "AmTote Technology" — means AmTote's (including any related parent and affiliate corporations) proprietary technology, including, software tools, hardware designs, algorithms, software (in source and object code formats), user interface designs, architecture, class libraries, objects and documentation (both printed and electronic), network designs, know-how, trade secrets and any related intellectual property rights throughout the world (whether owned by AmTote or licensed to AmTote from a third party) and also including any derivatives, improvements, enhancements or extensions of AmTote Technology conceived, reduced to practice, or developed during the term of this Agreement;

(Id. at ¶ 32 Subpt. a.). The TSA also included a promise not to reverse engineer, attempt to discover the source code, or otherwise derive protected information from AmTote as well as a non-disclosure provision that covers, among other things, third party relationships (Id. at PageID

---

[1] AmTote describes its totalisator services as comprising "an integrated combination of hardware, software and business processes for handling, calculating, paying out and reporting on pari-mutuel wagers for authorized pari-mutuel wagering entities" (DN 142 SEALED at PageID # 3496).

[2] AmTote describes pari-mutuel wagering as "a betting system wherein all the amounts of money wagered by a group of players on each of the possible outcomes of a contest (e.g., a live or historical horse race) are pooled and the payoff odds are calculated by sharing the pool, minus standard deductions such as taxes and house take, amongst all winning bets" (DN 142 SEALED at PageID # 3496 ¶ 13).

# 3501-02). AmTote asserts it also held meetings with representatives of Defendants where AmTote revealed additional confidential information, including information about system design and how the totalisator communicated with the terminal server (Id. at PageID # 3505).

AmTote alleges that agents of Defendants violated the terms of the TSA when officers of Kentucky Downs provided confidential and proprietary information to officers of Exacta (Id. at PageID 3506 ¶ 59). Specifically, three officers of Kentucky Downs - Rayford Reid, Nicholas Hughes, and Corey Johnsen - founded and were officers of Exacta Systems at the same time the three were in possession of AmTote's confidential proprietary information (Id. at 3505 ¶ 54). AmTote asserts that Reid, Johnsen, and Hughes founded Exacta in part to create a competing totalisator service and in so doing communicated AmTote's confidential information to Exacta, thereby misusing the information to create the competing totalisator service (Id. at 3506).

AmTote additionally details specific features of the AmTote system it alleges Defendants misappropriated, including aspects of seed pool calculations, models for calculating game winners, and features of the central determinate translator (Id. at PageID # 3512-13). Additionally, AmTote alleges Defendants requested that AmTote train its employees on all aspects of the Instant Racing system with the understanding that the training and knowhow were the first step toward furthering the relationship between AmTote and Kentucky Downs by expanding Kentucky Downs' historical horse racing operation using AmTote's totalisator (Id. at PageID # 3512-13). Instead of using AmTote's totalisator, however, AmTote asserts Defendants used the expertise gathered from AmTote and subsequently installed Exacta systems at other historical horse racing facilities (Id. at PageID # 3513 ¶ 88).

Next, AmTote alleges Johnsen approached AmTote to inquire whether it would be possible to retrofit old slot machines, repurpose them as Instant Racing terminals, and interface

3

the renovated terminals with AmTote's totalisator (Id. at PageID # 3513-14 ¶ 89). AmTote developed a solution involving equipping the terminals with a logic box, peripherals, and a wiring harness that could interface with the AmTote totalisator as well as the design of a new player panel to fit the retrofitted terminals (Id. at PageID # 3514 ¶ 91). The retrofitting project continued for a number of months, and AmTote now believes Defendants were simultaneously developing terminals for the Exacta System, using AmTote's confidential information in the process (Id. at PageID # 3516-17 ¶¶ 98-100).

### B. The Scope of This Discovery Dispute

This case ("the AmTote case") is the companion case to Parimax Holdings, LLC et al v. Kentucky Downs, LLC et al, civil action No. 1:15-CV-00082-GNS ("the Parimax case"). The Parties have agreed to consolidate the two actions for purposes of discovery only, pursuant to the terms of the Second Agreed Amended Joint Scheduling Order ("the Agreement") (DN 118).[3] Paragraph 7 of the Agreement provides that discovery produced in the Parimax case shall be deemed to have been produced in the AmTote case, and vice versa (Id. p. 3). The Agreement further provides that requests propounded in one case do not count toward the total limit of requests propounded in the companion case (Id.).

The undersigned ordered a telephonic conference held on November 2, 2017 (DN 182).[4] The purpose of the telephonic conference was to ensure that, though discovery in the two cases is proceeding jointly, the parties did not believe a request propounded in one case to constitute a request in the companion case. The parties expressed that they understood requests for discovery to apply only to the case in which the requests were propounded, notwithstanding the fact that information gathered from the requests is deemed produced in both cases.

---

[3] Located in the Parimax case at (DN 67).
[4] Located in the Parimax case at (DN 134).

The text of Rule 37(a)(3)(B) provides that "**[a] party seeking discovery** may move for an order compelling an answer, designation, production, or inspection." (emphasis added). Thus, only the party who propounded the disputed discovery request may move for enforcement. Payne v. Exxon Corp., 121 F.3d 503, 510 (9th Cir. 1997) (holding defendant lacked standing to seek enforcement of codefendant's discovery request). The Sixth Circuit has not directly addressed this distinction, but other district courts have reached the same conclusion based on a plain reading of the Rule. *See e.g.* Phoenix Life Ins. Co. v. Raider-Dennis Agency, Inc., Nos. 07-CV-15324, 08-CV-11562, 2010 WL 839416, *1 (E.D. Mich. Mar. 4, 2010) (Noting that a plain reading of the Rule suggests only the party who issued a discovery request may seek to compel a response); Kingsway Financial Servs., Inc. v. Price Waterhouse-Coopers, LLP, No. 03 Civ. 5560(RMB)(HBP), 2009 WL 72165, *3 (S.D.N.Y. Jan. 9, 2009) (same); In re Urethane Antitrust Litig., 237 F.R.D. 454, 457 (D. Kan. 2006) (same). While the present matter has the added wrinkle that two cases have been consolidated for discovery purposes, the reasoning is the same.

Here, AmTote and Parimax seek to compel responses from Defendants, and Defendants have filed a reciprocal motion to compel, contingent on whether the undersigned grants AmTote's motion. A thorough review of both parties' exhibits reveals that AmTote alone propounded the disputed discovery requests, and AmTote issued those requests to the Defendants in this case only, not in the Parimax case. If a party lacks standing to compel a response to a codefendant's discovery request, it must follow that a non-party also lacks standing, even if the non-party is involved in parallel litigation and feels entitled to the material. Here, Parimax had an equal opportunity to request this information from the Defendants. Alternatively, AmTote could have issued these interrogatories and requests for production in the

5

Parimax case, which would have enabled AmTote to assert relevance arguments from the Parimax complaint. To conclude, it is AmTote alone who presently has standing to seek an order compelling more fulsome responses as to the allegedly deficient discovery requests. Moreover, because these cases are not consolidated for trial, and based on the parties' mutual understanding that a discovery request in one case does not constitute a discovery request in the other, AmTote alone must demonstrate that the requested information is relevant to the complaint in the AmTote case. For these reasons, the undersigned will not look to the complaint in the Parimax case nor entertain either party's arguments regarding Parimax's right to discover the disputed interrogatories and requests for production.

C. Summary of Disputed Interrogatories and Requests for Production

Plaintiff classifies its first set of contested interrogatories as "relating to the development of the Exacta System" (DN 151 SEALED at PageID # 3600). This group includes Interrogatory No. 2 to Kentucky Downs, Interrogatory No. 2 to Exacta, as well as Interrogatory No. 4 to Kentucky Downs. Next, AmTote disputes Defendants' responses to a group of interrogatories AmTote describes as "interrogatories relating to how the Exacta System operates" (DN 151 SEALED at PageID # 3602). The interrogatories at issue in this category are Interrogatories No. 3 to Exacta, which contains five subparts. The final challenged interrogatory is Interrogatory No. 4 to Exacta, which AmTote describes as "relating to the terminals and terminal components used in connection with the Exacta System" (Id. at PageID # 3607).

Plaintiff next outlines challenged requests for production. The first set of disputed RFPs fall into the category of documents relating to the development of the Exacta System. These include AmTote Requests for Production of Documents Nos. 29-31, 35-40, 42-44, 46, 75, and 76 (DN 151 SEALED at PageID # 3605). To summarize, this group of requests seeks documents

reflecting communications among various parties that relate to either the development, operation, or maintenance of the Exacta System as well as training materials, GLI reports, engineering specifications, functional specifications, version change information, manuals, and other material relevant to the design of the system's hardware and software components (DN 151 SEALED at PageID # 3605-07). The next set are "[p]roduction requests relating to the development and design of reports used in connection with the operation of the Exacta System, including correspondence and documents relating to Win Systems, such as instructions provided to Win Systems" (DN 151 SEALED at PageID # 36-8). The disputed requests are RFPs 48-52. This set of requests, as its classification suggests, asks each Defendant for documents related to the development and design of reports generated by each defendant in connection with the operation of the Exacta System as well as documents involved in the engagement of Win Systems, instructions to Win Systems, and any documents related to the development or design of reports that Win Systems may have generated (DN 151 SEALED at PageID # 3609-10).

AmTote next challenges certain redactions in documents produced by Defendants (DN 151 SEALED at PageID # 3611-16). AmTote alleges Defendants redacted a significant number of documents, oftentimes doing so without explanation other than a perfunctory reference to trade secrets or privilege. However, the undersigned conducted a telephonic conference on November 14, 2017 (DN 184). The parties discussed this issue, and the undersigned understands the Defendants are in the process of addressing this by providing logs that describe the redacted material in sufficient detail so AmTote can understand the asserted privilege and decide whether to challenge the designation. Therefore, the undersigned will not address this portion of AmTote's motion in the present order.

Finally, AmTote seeks access to Exacta's math definition file. According to AmTote's expert, the math definition file is likely software code that calculates how payouts are made, but it is alternatively possible that it is a table of numbers working in conjunction with software code (DN 152-10 at PageID # 3889). AmTote's expert further notes that he cannot effectively compare the AmTote System with the Exacta System without access to this information.

## D. Standard of Review

In relevant part, Rule 26 states:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Thus, "[i]nformation is discoverable under revised Rule 26(b)(1) if it is relevant to any party's claim or defense and is proportional to the needs of the case." Fed.R.Civ.P. 26, Advisory Committee's Note for 2015 Amendment. The scope of discovery is within the broad discretion of the trial court. Ghandi v. Police Dept. of Detroit, 747 F.2d 338, 354 (6th Cir. 1984). Notably, district courts within the Sixth Circuit have agreed that the 2015 amendments do not change the basic principle that Rule 26 is to be liberally construed to permit broad discovery. *See e.g.* He v. Rom, No. 15-CV-1869, 2016 WL 5682012, at *13 (N.D. Ohio Oct. 3, 2016); Suzette Scott-Warren v. Liberty Life Assurance Co. of Boston, 3:14-CV-00738-CRS-CHL, 2016 WL 5661774, at *5 (W.D. Ky. Sept. 29, 2016); Brooks v. Caterpillar Global Mining Am., LLC, No.

4:14-CV-00022-JHM, 2016 WL 5213936, at *7 (W.D. Ky. Sept. 20, 2016); Albritton v. CVS Caremark Corp., 5:13-CV-00218-GNS-LLK, 2016 WL 3580790, at *3 (W.D. Ky. June 28, 2016). Certainly, the movant bears the burden of demonstrating relevance, but that threshold is relatively low due to the purpose of the Civil Rules. Albritton, 2016 WL 3580790, at *3 (citations omitted).

### E. Relevance

AmTote seeks a significant amount of information about the development and design of the Exacta System. The Defendants have argued that the scope of discovery should extend no further than three trade secret claims, specifically:

> a. Historical Horse Racing Installation, Set-Up, and Operation—involves training and support of Kentucky Downs' personnel on operation of the Instant Racing system, including training on back of house systems, video servers, customer tracking, network architecture, equipment lists, equipment pricing, and labor and training costs;
>
> b. Modification of Slot Gambling Terminals to Operate Historical Horse Racing Games—involves the information used by a third party (Cole Kepro) to retrofit slot machine terminals to be compatible with the Instant Racing system, including hardware specifications, component lists, pricing and sourcing for component parts, wiring instructions, specifications and design drawings of the logic box, wiring harness, and player panel, and a retrofitted terminal prototype;
>
> c. Operator Interface—involves access to historical racing accounting reports, including Community Source Liability Report, Game Liability Summary Report, IRS Report, Outs Report, Bill Transaction Report, Machine Sales Report, Terminal Transaction Report, and Admin Log, as well as access to the formatting, terminology, and accounting-related data used to generate these reports.

(DN 165 SEALED at PageID # 4478 (cleaned up)).

Defendants argue that AmTote's contractual claims are insufficient to warrant discovery of so much confidential information (DN 165 SEALED at PageID # 4486). By the Defendants' construction, the trade secret claims relate only to hardware components of the Instant Racing system. And, finally, AmTote only provided totalisator services, so according to the Defendants, even if the undersigned finds the scope of discovery to be broader than the trade secret claims, the Court should require Defendants to produce only information relating to the portion of the Exacta System that functions as a totalisator.

The undersigned will not endorse such a narrow view of this case for purposes of this discovery dispute. The claims within the third amended complaint guide this Court's determination of what constitutes relevant information under Rule 26(b)(1). As outlined above, AmTote alleges that Defendants made use of AmTote's proprietary information in the creation of its Exacta System, violating the terms of the TSA and misappropriating trade secrets. Therefore, both broader categories of information, described by AmTote as documents and information relating to the development of the Exacta System and documents relating to the operation of the Exacta System (DN 151 SEALED at PageID # 3600, 3602), bear directly on allegations within the complaint. While Defendants argue that AmTote provided only totalisator services, this ignores the plain language of the TSA that, on its face, covers the confidential information of third parties doing business with AmTote. Whether this third party claim is meritorious is not the focus of this discovery dispute, and the undersigned is concerned only with ensuring that there is some basis for connecting AmTote with the Instant Racing system. The Court finds AmTote has cleared this hurdle.

Additionally, AmTote alleges that Defendants asked AmTote to assist in retrofitting slot machines to be used as instant racing terminals. Therefore, the broader category, which AmTote

defines as "interrogatories relating to the terminals and terminal components used in connection with the Exacta System[,]" (Id. at PageID # 3603) is also likely to lead to the discovery of relevant information. The undersigned finds that the class of information described as "[p]roduction requests relating to the development and design of reports used in connection with the operation of the Exacta System, including correspondence and documents relating to Win Systems, such as instructions provided to Win Systems" (DN 151 SEALED at PageID # 36-8) is also likely to lead to the discovery of relevant information. Thus, the categories of information and documents sought by AmTote are relevant, within the meaning of Rule 26(b)(1), to the claims asserted in its complaint.

The next issue is whether specific interrogatories and requests are themselves overly broad or unduly burdensome. First, Interrogatory No. 2 to Kentucky Downs and Exacta reads as follows: "identify all consultants and/or business partners involved in the development, launch, operation or maintenance of Exacta's historical horse racing wagering or totalisator services at Kentucky Downs, including the individual or entity's full name, principal place of business and best available contact information." (DN 151 SEALED at PageID # 3600). Defendants responded that the interrogatory was overly broad, and they did not understand the terms "development," "launch," "operation," or "maintenance." (Id.). Plaintiff argues the information is relevant to its claims, and the information will aid Plaintiff in determining whom to depose and ultimately assist in proving that the Exacta System was improperly derived from the AmTote system.

The undersigned finds this interrogatory neither overly broad nor particularly unclear. The world of individuals involved in creating the Exacta System cannot be so large as to create a

legitimate issue. Moreover, the terms "development, launch, operation, and maintenance" should be given their ordinary understanding, and Defendants are ordered to produce more complete responses to this interrogatory.

AmTote's Interrogatory No 4 to Kentucky Downs asks the Defendant to "[i]dentify all meetings, including in-person meetings, video conferences and/or telephonic meetings, between Kentucky Downs, or its consultants, with any party, related to the development of any aspect of a historical horse racing product other than Instant Racing, from January 1, 2010, to the filing date of this action, including the date, subject matter, and persons present at such meetings." While the language of this request is quite broad, it is not unreasonably so. Kentucky Downs responded that it did not develop the Exacta System and identified Jeremy Stein of IntuiCode Gaming Corp., Glen Rose of IntuiCode Gaming Corp., Jeff Lind of IJJC, LLC, and Joseph Enzminger of IJJC, LLC (DN 152 at PageID # 3704). Perhaps these individuals are the software developers in the literal sense of the word, meaning those individuals whose job is to take someone's idea for a computer program and actualize that idea, but it is apparent that when AmTote refers to meetings relating to the development of the Exacta System, it means more than this narrow read of the term development. It is not believable that four individuals who work for neither Kentucky Downs nor Exacta are the only persons involved in the creation of the Exacta System, as this would mean those four individuals independently created the Exacta System with no input, direction, or interaction with representatives of Kentucky Downs. Therefore, Kentucky Downs is ordered to provide a more fulsome response to this interrogatory.

Next are interrogatories relating to the operation of the Exacta System. Here, the first issue relates to AmTote's third interrogatory to Exacta, which reads as follows:

> Interrogatory 3: Describe in specific detail how the Exacta System operates, including, but not limited to:

12

> a. identification and operation of all math models;
>
> b. identification and operation of all game themes;
>
> c. identification and operation of seed pools;
>
> d. identification and operation of the operator interface for the Exacta System; and
>
> e. identification and operation of any and all reports generated in connection with the operation of the Exacta System.

(Id.).

Exacta first objects because it claims it provided AmTote with GLI[5] reports that Exacta alleges demonstrate how each component of the Exacta System operates (Id.). Additionally, Exacta argues AmTote has not advanced an allegation that Defendants misappropriated AmTote's software or game theme information, and AmTote has abandoned its seed pool misappropriation claim (Id.). As a result, Exacta refuses to respond to parts a., b., and c. of AmTote's interrogatory (Id.). As for parts d. and e., Exacta states that all responsive accounting reports are produced by Win Systems and are derived from existing Win Systems software (Id.).

AmTote contends that the crux of its claims is that Defendants took advantage of its access to AmTote and Parimax's proprietary information when Kentucky Downs was their customer (DN 151 SEALED at PageID # 3603). AmTote contends the most efficient way to prove or disprove these allegations is to have an expert examine the technical workings of the Exacta System, perform side-by-side comparisons, and opine as to whether the Exacta System was derived from AmTote or Parimax technology (Id.). Finally, AmTote argues it is irrelevant that Win Systems produced the requested reports, and Exacta should produce the reports if they are in Exacta's custody or control (Id.).

---

[5] Later in its motion, AmTote reveals that GLI is Gaming Laboratories International, an independent service that tests and certifies gaming and gambling systems (DN 151 SEALED at PageID # 3607).

The Civil Rules permit a party to serve on another party a request:

> (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items **in the responding party's possession, custody, or control**:
>
> (A) any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form[.]"

Fed. R. Civ. P. 34(a)(1)(A) (emphasis added). It is therefore irrelevant that the requested reports were generated by Win Systems. The question is only whether these reports are in Exacta's possession, custody, or control. If they are, Exacta has an obligation under Rule 34(a)(1)(A) to produce the documents if they are relevant within the meaning of Rule 26(b)(1). According to the affidavit of AmTote's expert witness, Garry Kitchen, these system reports and operational details are essential in enabling him to form an opinion regarding whether the Exacta System is an improper misappropriation of the AmTote system (DN 152-1 at PageID # 3697-98). Having considered Mr. Kitchen's affidavit along with the claims set forth in the third amended complaint, the undersigned concludes that the requested reports are relevant within the meaning of Rule 26(b)(1), and Exacta is directed to produce them.

The undersigned notes that this analysis is also relevant to RFP Nos. 48-52, which ask for documents relating to communications about and the design of reports generated by the Exacta System. It is therefore ordered that Exacta provide more fulsome responses to sections d. and e. of Interrogatory No. 3 as well as to RFPs Nos. 48, 49, 50, 51, and 52.

Similarly, subparts a., b., and c. of Interrogatory request relevant information. As AmTote points out, the third amended complaint alleges that the Exacta System is derivative of the entire AmTote system and that Exacta has even appropriated information from RaceTech.

AmTote may not have directly provided services that would ordinarily relate to, for instance, game themes, but as already noted, the undersigned finds that the third party language in the TSA is sufficient to demonstrate relevance under Rule 26(b). Therefore, Exacta is ordered to supplement its responses to sections a., b., and c.

AmTote's fourth interrogatory to Exacta reads "[d]escribe in specific detail each type of terminal that is, or has been, offered for use in connection with the Exacta System including a detailed list of components and the date at which each terminal type was first operational" (DN 151 SEALED at PageID # 3607). Exacta responded that it purchases completed terminals from Intuicode Gaming Corporation, and third parties provide Intuicode with the terminals' hardware components (DN 151 SEALED at 3603-04).

AmTote objects to this as an incomplete response and seeks more detailed information about the terminals and hardware, arguing that one of its claims asserts that AmTote provided Kentucky Downs with a detailed subassembly list of the hardware components comprising AmTote's retrofitted terminals, and Kentucky Downs relied on this information when developing the Exacta System (DN 151 SEALED at PageID # 3604-05). As a result, AmTote seeks a response with specific information about the terminals and their components.

As detailed above, AmTote alleges in the third amended complaint that Kentucky Downs asked AmTote to assist in retrofitting slot machines to serve as Instant Racing terminals. AmTote alleges IntuiCode was part of this process as well. It does not matter that IntuiCode makes the current terminals for the Exacta System because they are nonetheless in the possession, custody, or control of Exacta. Moreover, because AmTote has met its burden by demonstrating that information about the terminals is relevant to its asserted claims, Exacta

should provide AmTote with a more detailed response. Therefore, Exacta is ordered to supplement its response to this fourth interrogatory.

The parties' arguments regarding the disputed RFPs are much the same as the arguments over the disputed interrogatories. AmTote seeks information relating to the design and operation of the Exacta System, and Defendants attempt to narrow the scope of Plaintiff's claims. The undersigned has addressed this argument and found the design and operation of the Exacta System to be centrally relevant to AmTote's claims. Thus the only remaining issue is whether any of the individual RFPs are overly broad or unduly burdensome.

RFP No. 29 to Kentucky Downs states:

> 29. Please produce any and all documents and communications constituting or relating to designs, technical specifications, engineering specifications, functional specifications, charts, manuals, version changes, diagrams, and other documents that describe the hardware and/or software relating to the Exacta System, where such documents and communications describe:
>
> a. database structures available or intended to be available;
>
> b. function calls available or intended to be available;
>
> c. database trigger software code to be written; and
>
> d. external-facing interfaces to gaming terminals.

(DN 152-3 at PageID # 3737).

Kentucky Downs responds, in relevant part:

> RESPONSE: Objection. This request is overly broad, unduly burdensome, irrelevant, and not in proportion to the needs of this case because it does not deal with the three trade secrets AmTote alleges are in issue in this case. In particular, none of these requests address the Proprietary Operator Interface, which is the only claim directed against Kentucky Downs in that the other two trade secrets misappropriation claims are directed at purported

trade secrets Magellan, not Kentucky Downs, allegedly misappropriated. Kentucky Downs is not Magellan and cannot answer on behalf of Magellan with respect to the claims against Magellan.

(Id.).

Kentucky Downs offers either "see response to Request No. 29" or a substantially similar objection to fifteen other RFPs, which request the following:

> 30. Please produce any and all documents provided by, and communications from, Kentucky Downs to Exacta, or to any person who has subsequently been employed by Exacta, related to the design, functionality, or operation of live or historical horse race wagering totalisators between January 15, 2010, and the present.
>
> 31. Please produce any and all documents and communications describing how Exacta and/or Kentucky Downs developed software requirements for the Exacta System, including documents identifying the sources of information used to generate these requirements.
>
> 35. Please produce any and all documents and communications relating to the conception, design, and development of the Exacta System or any aspect of it from between January 15, 2010, and the filing date of this action.
>
> 36. Please produce any and all documents and communications between Exacta and Kentucky Downs regarding the development and operation of the Exacta System.
>
> 37. Please produce any and all documents and communications between Exacta and IntuiCode regarding the development and operation of the Exacta System.
>
> 38. Please produce any and all documents and communications between Exacta and IJJC regarding the development and operation of the Exacta System.
>
> 39. Please produce any and all documents and communications between Exacta and Magellan regarding the development and operation of the Exacta System.

42. Please produce any and all documents and communications relating to the conception, design, and development of the math models (as that term is used in Exacta's answer to RaceTech KY's interrogatory #5) used by the Exacta System between January 15, 2010, and the present.

43. Please produce any and all documents and communications relating to the conception, design, and development of the Central Determinant Translator (as that term is used in Exacta's answer to RaceTech KY's interrogatory #5) used by the Exacta System between January 15, 2010, and the present.

44. Please produce any and all documents and communications related to training or education received by anyone at Kentucky Downs related to the Exacta System, including but not limited to slide presentations, training manuals, reference guides and explanatory emails.

46. Please produce any and all GLI reports, including drafts, related to the Exacta System, including, but not limited to, MO-399-ENR-14-02, 10.8.2014; MO-399-ENR-14-03, 12.23.2014; MO-399-ENR-14-03, 1.21.2015; MO-399-ENR-14-03, 1.26.2015; MO-399-ENR14-03, 1.28.2015; MO-399-ENR-14-03, 2.3.2015.

(DN 152-3 at PageID # 3738-43).

The undersigned is cognizant that these requests seek a substantial amount of confidential and proprietary information, but confidential and proprietary information is at the center of this dispute. It is common for courts to order parties to turn over source code when some type of infringement of proprietary information is alleged. Moreover, there is a protective order in place in this case that protects sensitive information (DN 63). Finally, AmTote has convinced the Court via the affidavit of expert Garry Kitchen that viewing the source code and other schematic and planning materials outlined in the requests above is essential if AmTote is to prove its claims. *See, e.g.* Metavante Corp. v. Emigrant Savings Bank, No. 05-CV-1221, 2008 WL 1969596, at *3 (E.D. Wisc. May 5, 2008) (The presence of a protective order, the relevance of the source code to the claims at issue, and the necessity of the source code for a party to prove its

claim demonstrated the requisite need for the code); <u>Dynamic Microprocessor Assocs. v. EKD Computer Sales</u>, 919 F.Supp. 101, 105-06 (E.D.N.Y. 1996) (same).  The undersigned wishes to avoid confusion and future litigation of this issue, and so it is ordered that Exacta shall turn over the source code and other relevant documents pursuant to the conditions set forth in the Order portion of this opinion.

### F. Certain Redactions

AmTote has complained of certain redactions within the documents Defendants have already produced.  The undersigned addressed this issue in a telephonic conference held on November 14, 2017, and Defendants have been ordered to produce a redaction log detailing the reasons for their redactions (DN 186).  Therefore, this portion of AmTote's motion is denied as moot.

### G. Defendants' Motion to Compel

Defendants have filed a reciprocal motion to compel that seeks a quid pro quo exchange of information.  In other words, to the extent the Court will allow AmTote access to Exacta's software and source code to prove Exacta misappropriated AmTote's information, Exacta wants access to AmTote's software and source code to prove it didn't.  However, much of that motion concerns interrogatories and requests for production issued to Parimax.  As a procedural matter, the undersigned is addressing the substance of this motion where it is filed in the Parimax case. Here, Defendants' motion (DN 153 SEALED and 154) is denied.

**ORDER**

**IT IS HEREBY ORDERED THAT:**

1. AmTote's motion to compel (DN 151 SEALED and DN 152) is **GRANTED IN PART AND DENIED IN PART**;

2. Defendants' motion to compel (DN 153 SEALED and DN 154) is **DENIED**.

3. Defendants shall supplement their responses to AmTote's interrogatories and requests for production as detailed above;

4. With respect to the source code:

A. Exacta shall turn over the documents pursuant to the terms of the agreed protective order (DN 63);

B. Pursuant to ¶ 3 of that protective order, the source code shall be given an attorneys' eyes only designation;

C. AmTote shall consult its expert to determine the usual format for producing such information. The parties shall confer, and where possible, Exacta shall turn over discoverable documents in that format;

D. Unless agreed upon by the parties, AmTote shall not copy any material, in whole or in part, and upon the conclusion of litigation, AmTote shall return all material to Exacta with an affidavit affirming that nothing has been copied and that only AmTote's experts and attorneys have viewed the material.

Copies: Counsel